Let me start with Billings v. Murphy, case number 22-2010. Okay, good morning. May it please the court. Stephen Bergstein for the Plaintiff Appellant and Billings. We have two issues in Billings. We have a reasonable accommodation slash disparate treatment claim and we have a retaliation claim. And let me start with the reasonable accommodation discrimination claim. When Lt. Artuse performed the safety demonstration on May 2nd with plaintiffs, she objected on religious grounds to having a male supervisor remove her religious clothing, but Artuse ignored the objection and gave her basically a choice, any one of which would have violated the plaintiff's religious principles, work without the hijab, go home and deal with the consequences, or demonstrate to him that the clothing could be removed without any safety problems. Again, all three of these options violated her religious principles. What did he mean by deal with the consequences? It doesn't sound good. It's not clarified. It could mean a lot of different things. Right, but it's drawing the inference favorable to plaintiffs. It means go home and suffer discipline. If you walk out on the job because you are objecting to something your supervisor does, that could be insubordination. But it sounds like a warning, deal with the consequences. Well, option number three, just on its own, is not necessarily problematic, I thought. I thought it was the follow-up that made it problematic. Because if she was able to demonstrate that it could be taken off without placing her at risk, I mean, how would that be a problem? The problem is that she couldn't do the demonstration in front of a male supervisor. Right, that's what I mean. That's what I thought, that if there had been, for example, a female supervisor there, she wouldn't have had any complaint, right? We wouldn't be here. Right. The central problem is that. Right. In other words, that it was against her religious practice to remove the hijab in front of a man. Correct. Who is not a family member. And she complied because nobody wants discipline. So the district court, and this is, I think, the rub, said that that is not enough in terms of material adversity. We require, based on our own, that is, Second Circuit case law, more. That is, some other material adverse action. And you read some of our cases, certainly some of the orders, and you read Knight, for example, and they seem to suggest that we require a material adverse action beyond the mere failure to accommodate. How do we deal with that? Is there some intervening Supreme Court decision that helps us to deal with that? Collins. I have a multi-pronged answer. First, I think the failure to accommodate in a situation like this seems material enough because it's central to her religious belief. And we know what happened after she complied with his order. She collapsed with panic. But a few weeks ago, or last week, this court issued a ruling and a free exercise claim. It's not employment. I sent a 28-J letter. You don't have to show substantial burden on religious practice anymore. That can translate to our case, you know, material. But this is not an undue burden issue. Correct. But the point of Kravitz was the case. You don't have to show substantial burden to make out a religious discrimination claim. What Judge Roman essentially said was the burden wasn't substantial. It wasn't material. I think once we get into whether somebody's religious practice is trivial or substantial or material, that's not an inquiry we can answer under Rule 12. Right? I mean, then we're second-guessing the impact caused by the reasonable accommodation denial. And some of the recent religious discrimination cases say that we don't really second-guess somebody's sincerity or the materiality of their religious belief. That's really our argument here. She was denied a reasonable accommodation. You know, that's built into the statute. You have to accommodate somebody's religious belief. How would you phrase that accommodation that she was denied? The accommodation denial was being ordered to remove the hijab in the presence of a male supervisor, contrary to her religious principles. Correct, that the accommodation that you claim she was denied was the substitution of a woman supervisor instead of a male supervisor. Correct. And the complaint says that female supervisors who were in the building could have done it. And R2 said, no, you're doing it on my terms or else there will be consequences of some kind. Had a woman supervisor not been available, then what? I mean, I understand that that's a hypothetical question. My answer to that would be if a woman supervisor was not available, I guess she could go home for the day, come back tomorrow when there will be a woman supervisor, and then give her an off day, give her leave with pay. So it's just some other form of accommodation. Correct. And I'm sure there's enough women supervisors at the facility. There will always be one available. The government asks us, I think, to view this as a subset of terms and conditions or terms or conditions or privileges of employment. That is that the material adversity relates to that as opposed to some other form of adverse action, usually some discipline in this case. Do you agree with that view? That's a very narrow interpretation. I think a reasonable accommodation requirement denial would affect the terms and conditions of your employment. At some point under Rule 12, I don't know if we can micromanage that question. I imagine there might be some religious choices that an employee wants that would not be material, but this wouldn't count. Is there, in your view, and we'll also ask the government this, a case that – a precedential case from the circuit that's on point with respect to religious accommodation where we have described the failure to accommodate itself as affecting in a material way the terms or conditions of employment such that we don't need some other material adverse action or don't require some other material adverse action? I don't know of a published case, maybe this one. But TWA versus Hardison has language that we're relying on. It's an unlawful employment practice for an employer not to make a reasonable accommodation short of undue hardship for the religious practices of the employees. It's an unlawful employment practice. That's under the statute. So that's as close as we can come. You know, the whole point of a religious accommodation is to satisfy Title VII's obligation for the employee to respect an employee's religious principles. So when we're drawing the distinction between is a reasonable accommodation denial the same as disparate treatment, it is because you're discriminating against her. Ordinarily, the accommodation is something that allows the employee to do her job, notwithstanding scruples, disabilities, or whatever. Here, the employer said, okay, you can wear a hijab while you're on the job. So, and I think this was important for the district court, the accommodation that allowed her to do the job for which she was hired was granted. It's the way they effectuated the reasonable accommodation. I understand that the Office of Diversity Management allowed her to wear the hijab if you satisfy these conditions. On May 2nd, the way the accommodation was carried out violates Title VII because it gives her really a cruel choice. This seems to make this case unique in the sense that the accommodation necessary for her to do her job every day of the year was conceded. Right. From that point on, she can wear the hijab. But on May 2nd, the question isn't whether she's allowed to wear this article of clothing for as long as she works there. It's what happened in that office. I want you to remove it to show that it's safe, and he says, you're doing it in my presence. My only question is, doesn't that make this case unique? Which is not necessarily good for a plaintiff, but it makes it interesting. It's unique in the sense that once she passes the test, she can wear it. Sure, I don't know of a case quite like this where the reasonable accommodation is a one-shot failure by management. Because afterward, she's able to wear it. But what happened on May 2nd was serious. We maintain that it's serious. Are you framing what happened on May 2nd as basically a modification of the accommodation that was provided by the employer? So in other words, if the accommodation had stopped and been complete, and there was nothing else beyond the initial, I guess, the written description of the conditions under which the hijab could be worn, that would be satisfactory to you. Let me just pause there. Is that right so far? I think so. The case really boils down to what happened on May 2nd in the office. Just conceptualizing what you think the problem is, is your view that basically the accommodation itself was sort of modified in a way that was adverse to your client by adding an additional condition to it? So if you think of the initial accommodation as yes, you can wear the hijab, but then there were conditions attached to it, right? And it can only be of a certain dimensions, and it needed to be checked for safety. And then there was an additional condition added on May 2nd, which is, and the way it needs to be checked for safety is by having it removed in front of a male supervisor. Yes. Is that an additional condition? It's an additional- To modify the accommodation that was problematic in your view. Yes. There's a couple of ways of looking at it. It's an additional condition that violates Title VII, and also the initial accommodation that was granted from the Office of Diversity that said you could wear the hijab was not effectuated properly. There are cases that say that failure to carry out a reasonable accommodation, that in itself violates Title VII or the ADA. So under either formulation, that's where we are here. It was May 2nd. Either we want to frame it as a modification that violated Title VII, or she makes an additional reasonable accommodation request and says, I can't do it in your presence, I need a female supervisor. Now I'm confused. I thought in answer to my question earlier, you assigned the injury to the fact that, to a protected individual, your client, to the fact that she had to remove her hijab in front of a male supervisor. Correct. Correct. And that was- That was just central interest. That's why we're here. Under Title VII. But the question was, how do we frame it? Do we frame it as an illegal modification from the original accommodation, or do we frame it as an additional accommodation request by her that I can't do it in your presence, I need a female supervisor? Well, isn't the full accommodation, and I don't know why we would take it in stages, a failure to accommodate her religious practice that includes removing a hijab only in front of a family member or a woman? That's correct. That's the case. So you've reserved some time for us.  We'll hear from the governor. Good morning, and may it please the court. Anna Baldwin for the United States' Amicus. The district court erred in holding that the denial of a religious accommodation is not actionable under Section 703A1 of Title VII unless the plaintiff pleads that a further material adverse event occurred as a result of the employer's refusal to grant that accommodation. But that requirement is not found in the language of Title VII as enacted by Congress. Would you agree that it is found in some of our precedent? So there's night, which your brief cites, there are a couple of other precedents that suggest, some might say whole, that at least one of the elements is a material adverse action in addition to the failure to accommodate itself in the religious discrimination context. So the court has certainly defined an adverse employment action as including a materiality requirement, that a material change in the terms or conditions are something that is more than a mere inconvenience. And so even under this court's existing precedent, requiring an employee to submit to a work rule that conflicts with her religious practice where it would not cause the employer undue hardship to accommodate that practice is discrimination because that is going to inherently impose more than a mere inconvenience on the employee. The purpose when Congress amended Title VII to include religious accommodations as part of the definition of religion is to eliminate conflicts between religious practice and the ordinary work rules. So is the analysis in Vega, for example, where we made that clear with respect to the change in the terms and conditions is something more than a mere inconvenience and therefore triggering our material adverse action requirement. Is it your view that Vega changed or altered our prior precedent that suggested otherwise? Well, our view is that you could satisfy the Vega test because requiring an employee to submit to an accommodation to a work rule that conflicts with her religious practice necessarily alters the terms and conditions of employment. And that's consistent with the Supreme Court's understanding in Abercrombie that there are just three elements of the claim. That it's discrimination because of religion and the terms, conditions, and privileges. And so we think that that mere inconvenience understanding and that the denial of a religious accommodation is always going to be more significant than the mere inconvenience squares this case with its precedent, this court's precedent. But the United States would also like to point out that yesterday morning the Supreme Court heard argument in Muldrow. Muldrow. Right. Seems to implicate some of the issues here. Yes, sir. Although the question presented was narrower. If you listen to the oral argument, it was a very wide-ranging argument. Correct. So the question presented in Muldrow is whether you have to show additional harm regarding a lateral transfer. Is it just discrimination with respect to your terms, conditions, and privileges? If two jobs are equivalent in salary and benefits, is that enough to state a claim? Does essentially the harm element, do you have to show that you were transferred to a job that was worse than another? But as Your Honor observed, a lot of the argument yesterday really goes to- Unrelated to that, but it was a much broader question. Was related to the harm element. And is the harm of discrimination itself sufficient to meet Title VII statutory harm requirement? And the United States position is consistent with what the D.C. Circuit held in chambers, that once an employee has shown discrimination, and discrimination is differential treatment, on the basis of a protected characteristic and their terms, conditions, and privileges- Then what's the differential treatment here? What's the differential treatment here? The differential treatment is the failure to grant the accommodation because- I'm afraid you're going in a circle here. You said there has to be a differential treatment. And I don't know how she's being treated differently than anybody else. So in the religious- She may be discriminated against, but I don't see it as basically treating her differently than anybody else. So for the purposes of the definition of discrimination in the religious accommodation context, because of the statutory definition of religion, it includes failure to accommodate. And so the differential treatment is that every other employee can go to work and do their job without having a conflict with their religious practice. But the plaintiff is alleging in this case that she's unable to do that, and it wouldn't have caused the employer an undue hardship to accommodate her religious practice. So basically the discrimination here is treating her like everybody else. And Congress- Well, I- In some sense- So I don't see how that's differential treatment. You're treating her just like everybody else. She may very well have a claim, but I don't see that it's treating her differently than everybody else. I mean, she needs to be treated differently is her argument. So we acknowledge that the religion element is different from the other protected characteristics by design because Congress has the affirmative obligation. And so here again, you know, there's not a question of is this treatment regarding religion. It plainly involves her religion. And the point is that she doesn't have to show some further downstream consequence of the failure to accommodate in order to state a claim under the statute as properly understood. That you don't have- But also I thought that I read, was it Justice Scalia in Abercrombie, who says Title VII does not demand mere neutrality with regard to religious practices. Rather it gives them favored treatment. Absolutely. Isn't that the point? Absolutely. And so here in Ansonia- Whether we agree or disagree with that, that's the point at least from Abercrombie. Yes, absolutely, Your Honor. And the point here is that- So favored treatment, however, is not differential treatment, which is what I've been asking about. You just said that a plaintiff in this situation is entitled to favored treatment because Congress mandates particular deference to people's religious scruples. But earlier you said she's being treated differently. So the discrimination is the failure to accommodate the religious practice. So regardless, religion as, you know, it is entitled to that favorable treatment to when it doesn't impose an undue hardship on the employer, it has to be accommodated. And you don't have to have, you know, a disciplinary consequence. You don't have to lose your job. You don't have to suffer a further adverse event before you can vindicate the rights that Title VII and Congress gave. So let me just go back to what we said in Knight. Admittedly in 2001, what I think your argument is, is that that's been overtaken by some later precedent, both in our court and by the Supreme Court in Abercrombie. But we said to make out a prima facie case of religious discrimination under Title VII, a plaintiff must show that they held a bona fide religious belief conflicting with their employment requirement. They informed their employers of this belief. And three, they were disciplined for failure to comply with the conflicting employment requirement. And that three is what seems to conflict with what the government is saying. You're telling me that, well, you're telling me two things, telling us two things. One, that that's been overtaken somewhat by Vega and so on. But two, that there's actually no conflict. Explain that second part of the argument to me. So in other of this court's cases that look more broadly, you know, a religious discrimination claim is still a Section 703A1 claim. And so there's a way to harmonize the understanding of what the disciplinary consequence or additional adverse, it has to rise to the level of more than a mere inconvenience. And so the denial of a religious accommodation is always in the language of Vega going to be more than a mere inconvenience. And, you know, then more fundamentally, you know, The United States' second point is that there isn't that sort of material harm requirement is inconsistent with the text of the statute. And this court, at an appropriate juncture, should reconsider that. And the Supreme Court in Muldrow may also. So is it the government's position that we should wait for a decision in Muldrow to see if it sheds any light on the issues before, on the central issue here, as I understand it, before us? Well, if this court thought that it was compelled under existing precedent to affirm the dismissal of the complaint, then, yes, the government would say you should wait for Muldrow. But our reading is... Why do they already know that? But we believe that under the existing understanding of the Adverse Employment Act... If I lose, you should wait. Yes. That the state of the law, as the D.C. Circuit has gone on bonk, as, you know, the Fifth Circuit recently went on bonk and revisited their adverse employment... Welcome to the Second Circuit, so assume no embank. So assume no embank. That we think the denial of a religious accommodation requiring an employee to submit without accommodation to a work rule that violates her religious practice necessarily alters their terms and conditions in a way that is more than a mere inconvenience. So we think it satisfies existing precedent. And just, at least for my part, one more question. There's EEOC guidance here. Yes. And that obviously supports the position that you're taking today. Yes. How much deference... This is going to make some heads blow up, but how much deference do we use... Do we owe to the EEOC's guidance in this case, if any? You know, we haven't taken a position on that in this case, but typically, you know, the EEOC guidance would be entitled to persuasive sort of skid more deference. Okay. Thank you very much. Thank you, Your Honors. We'll hear from the Appellee's counsel. Mr. Fan. Good morning, Your Honors. May it please the Court. Dennis Fan on behalf of the State of New York. We do think that the central issue is, as Judge Jacobs identified it, and it is what makes this case unique, in that Docs granted a religious accommodation, and that accommodation letter set out a number of conditions that plaintiff needed to satisfy before starting to wear her hijab at the job. So she was there working at this Docs facility without wearing a hijab, and then throughout time got this accommodation letter, and before she started wearing it, she needed to abide by these conditions. The letter makes that very clear, and that's why there's not really a failure to accommodate claim here, because she got a religious accommodation. It's also why this case doesn't really have very much to do with the issues in Muldrow. Although the central point of resolution that the district court focused on was the lack of an additional material adverse action. Yeah, I think the district court did get turned around a little bit in some respect. I mean, the district court, if I can break this out a little bit, the district court first, in its first motion to dismiss order, thought there wasn't really a failure to accommodate claim at all. So it went through, and it said in a footnote on page 66 of the joint appendix, it said in a footnote, you know, if there is a failure to accommodate claim, which I'm not seeing, you know, I think that accommodation claim is denied. And then in its second motion to dismiss decision, it treated this as a discrimination claim. It treated this as any other discrimination claim as you would have in this circuit, where you require something that affects the terms and conditions of employment, then you need to have that sort of adverse action, as this court puts it. And it said, as I think my friend on the other side said, this is really about whether she was discriminated against in carrying out that accommodation. Plaintiff's own complaint here demonstrates that the accommodation was in fact approved, and the only question then is whether in carrying out that accommodation, docs did something to treat her differently than somebody else in her same shoes. And that's just not the case here. You can't really show differential treatment if docs, in fact, abides by the terms and the letters of her accommodation letter. That's what makes this case more similar to cases that are about voluntary action. So if you're saying that the accommodation letter contained conditions, and one of those conditions was the demonstration that the hijab could be removed instantaneously to prevent her from being assaulted or choked, and you're saying that one of those conditions was that she had to do that in the presence of a man, then why is that a religious accommodation since one of her religious tenets is that she can't do that? So that is a religious accommodation, and a plaintiff's obligation at that point is to come back to docs and say, look, I don't think that's reasonable. I mean, the Supreme Court has talked about this as- Did the letter specify that it would have to be removed in the presence of a man when it would seem to be nothing to accommodate doing it in front of a man or a woman? You just get a woman instead of a man. So the letter did specify two things that I think are relevant. One, it specified that it did need to be able to be removed quickly, and then the second thing it specified was that the check would be done by the Deputy Superintendent of Safety, who at that time was Defendant Murphy, and if she hadn't- That doesn't stop the person from deputizing somebody else to do it. I mean, you could say something has to be approved by the Attorney General of the United States. That doesn't mean that it comes to the desk of the Attorney General in all his glory. Right. I mean, I definitely think that if she had an issue with that statement, that this needed to be a check done by the Deputy Superintendent of Safety, who, of course, is in charge of safety at this facility, so it would be natural that he would be the one doing these sort of safety checks. But if she had a problem with that, the letter then says- But as a point of information, was it done by him? It wasn't actually done by him. No, it wasn't. But that's not really- I take that not as her complaint. It didn't have to be done because he could deputize other people to do it. He has people working for him. Right. And I think, to be fair, I don't think she would have a stronger claim, plaintiff would have a stronger claim, if the Deputy Superintendent of Safety himself did it. It's not that the plaintiff thinks that, well, in fact, it shouldn't have been Captain Artuse who did the safety demonstration. It should have been the Deputy Superintendent of Safety doing the demonstration. Just take the example of, you know, had the Deputy Superintendent of Safety done the demonstration, we'd be in these exact same shoes, and we would have- So, yeah, could you just back up? Because I think you had started a sentence and didn't finish it. Something to the effect that if she didn't like the accommodation, she could have- Yeah, if she didn't like the accommodation, usually, as the Supreme Court has said and SONIA Board, these are bilateral cooperation type of situations where you're supposed to go back to the employer. You're supposed to say, hey, look, there's something weird about these conditions. Didn't she do that with Artuse? She shows up, right? She is told to take it off in front of me or go home, basically. And she says, well, I want a female supervisor. And he says, well, there's nobody here. So I guess I'm not sure. Are you saying that she didn't speak up? Because she did, I think. Or are you saying she didn't speak up through the proper channels? What exactly are you saying? I think she didn't speak up at the right moment. Because what the letter says, and if you look at page 53 of the record, it says prior to the implementation of this accommodation, as in before you start wearing your hijab in the facility, prior to the implementation, you need to be okay with all of the listed conditions. But it says the hijab you intend to wear to work must be checked by the deputy superintendent of security to confirm that it meets the guidelines specified in this approval. If any safety or security issues arise, blah, blah, blah, it must be checked. And what it doesn't say, and I think that this is to me, but I may be mistaken, Mr. Fan, in the crux of it, factually, is you're going to have to take off your hijab in front of the deputy superintendent of security, male or female. Does it say that? It doesn't say that in those exact terms. It suggests that, but we're talking about these employees. I don't even know, so I'll have the specific language of the complaint in front of me, that she knew at that point who the deputy superintendent of security was. But as I understand it, she was somewhat surprised. And then she says, I can't do this. I've got to do it in front of a woman or a family member. Right. And I think if at that moment. . . Do you agree that that's a fair reading of what happened here? Well, I think she didn't. . . I mean, I think a fair understanding is that she didn't fully process what was in the. . . I think that's why we're here. I think what the docs meant to communicate is that the deputy superintendent of safety was going to be making sure that all of these different bullet points were checked off, and that he was the one who was in charge of it. I think you can kind of piece together that prior to the implementation of this, as in prior to you wearing your hijab, you need to have this checked by the deputy superintendent of safety. But she went along and she started wearing her hijab. I mean, that's what makes this quite different. She went to work with it. She just showed up for work and said, here I am, right? And she's called to Murphy's office. So it's not like she was walking around at work for a few days with this, right? No, she wasn't walking around for a few days with it. I mean, she got the. . . And this is when she shows up. . . The first day she shows up for work after the accommodation is granted, right? Right, that's correct. But I think by doing that, she at least demonstrates that she's okay with the terms of this sort of accommodation letter. So this gets us to the government's argument and her argument. Now she says that however you want to chop up where the reasonable accommodation was not satisfied, she says that that represented a material alteration in terms and conditions of her employment, and just as a per se matter, and that that is supported, according to the government, by Abercrombie, by Vega in our own case law. What is your response to that? I think the United States on this respect goes a little bit too far. It still has to be an accommodation denial with respect to something employment related. If an employee asks about something that's not related at all to their employment, and you deny that accommodation, you don't have a religious accommodation claim, even though there's a strict denial of an accommodation. With respect to the other aspects of it, of whether you need, as Your Honor was saying. . . Let me ask you this. If she had set aside the ambiguities in the record, and she had asked for an accommodation that said I need a male, I need a female, a woman, to take my hijab in front of, take off my hijab in front of, then that would squarely be before us, that issue. And then what? I think that would be squarely before us. And then what? Well, I think at that point, this is the whole reason why you are supposed to have these accommodation processes play out before people start carrying them out. So would the refusal, I guess I'll follow up. Would the refusal to do that, would that constitute a material alteration in terms of conditions? I think that would be employment related. I think if I said I'm going to do a safety check on you, that's an employment related event. In the same way, if I brought a discrimination claim, and it was just an employer was like, if you are African American, I'm going to do safety checks on you at work, and only African Americans are going to do safety checks at work, I think we would say that involves the terms and conditions of employment. But the thing that makes this case unique is the fact that she got a religious accommodation letter, and the fact that by getting that letter, she didn't then go and at the bottom of the letter it says, if you have questions about this, if you have concerns about this, contact the diversity office. And she had the full opportunity to do that. She had a union representative with her at that. That sounds like an exhaustion type argument, not a work related argument. I mean, how is this not work related? Because you were suggesting, I think, that she just didn't follow the correct processes to make the request. How does that make it more or less work related? The point, I think, was neither, that it was not work related or was it an exhaustion requirement. I think it's a question of what she's objecting to and what she's agreeing to. You can have changes to your employment that you agree to that otherwise would be adverse actions. You know, Muldrow was about transfers. If you say, look, I want to be transferred from one office to another office, that is on me as an employee, then you don't have a discrimination claim. What is it that she agreed to? So I think before the implementation of this letter, before the implementation of the conditions, she started wearing her hijab at work. By doing that, she agreed to these conditions. I think that's ultimately the rub of it. I mean, of course, your honors can read the letter. So you're making a different argument. I didn't understand it. But maybe, let me restate it. You tell me whether I'm accurately characterizing your argument. You're saying she asked for an accommodation, which is I want permission to wear a hijab at work. She got that permission. So, basically, she got what she wanted and she's got nothing to complain about? Is that what you're? I mean, the long and short of it, yes. But, you know, she got the hijab at work. She also got these conditions, it said, prior to the implementation of the hijab. Isn't there another way to look at this? Why shouldn't we look at it this way? That there was a duty on the part of the employer and the employee to confer and to reach an accommodation if they can. She raised an objection at the point where she was asked to remove the hijab. At that point, wasn't it the obligation of the employer to try to figure out how that religious objection, which was firmly held, could be accommodated? Instead, he said, do it, remove the hijab in front of me or you're fired. And to say, you're going home and your adversary says that will be construed by a jury or a judge as you're fired. So, to tell somebody they're fired, isn't that a further material adverse event? That's the ultimate. Just really quickly, I disagree that deal with consequences means that you're fired. It's sort of naturally, if you miss work without reason or without cause, you have consequences to deal with that. But the basic question of whether we should construe this as another accommodation request, I think as a basic matter, if you get an accommodation request approved, and if you're looking at this from the perspective of, say, Captain Artuse, he's there and he's like, look, I have this accommodation request. It's an approved accommodations request. I can't go and change your accommodation request just because you now want me to do that. If you wanted a different accommodation, you can go back to the diversity office. But I can't just look at your accommodation letter and say, you no longer need to do this. Well, what can the employer say when you're going to have to go back to the diversity office? You're going to have to go back to human relations. No, I mean, I think there are many ways that the events could have happened. There are many ways that the employer could have negotiated the way through this. Instead, the employer said, as your adversary is prepared to argue, you have to do it. You have to remove it in my presence, though I'm a man. Otherwise, you'll deal with, go home and deal with consequences. To go home means you're no longer employed. Yeah, I mean, the employer said, look, you can deal with the consequences by going home. You can continue exactly what you've been doing for the past at least two years. When he said go home, he wasn't saying have lunch. No, I think there are- It's a fair argument. It is an argument that he was saying, go home and don't come back. I think there are, yeah, I agree with you, Judge. There are consequences if you leave work, right? And those consequences would be adverse consequences, correct? Most likely, yes. I mean, if there were put in place. So why do we have to consider whether in this case the plaintiff can proceed without alleging adverse consequences when the allegation, as I understand your adversary's argument, is that there were adverse consequences. You go home and don't come back. Yeah, I mean, I agree with Your Honor that I don't think we get to that issue at all of whether this case is on the side of adversity, right? I think even if you took this as there was no accommodation letter, there was never an accommodation letter granted, and Captain Artuse just called her into the office and said, you know, take off your hijab or go home and deal with the consequences, I think that scenario is one where you would say, look, that has to do with your terms and conditions of employment. You can't do that to somebody because they're Latino. You can't do that to somebody because they're a woman, you know, in the same way of- That's not what we have here. The principal thing that makes this case different and what we're refsing on is that there was an accommodation letter approved, and we think that accommodation letter is- So now that I very much understand this argument, I've got two, maybe three questions. The first is, why is that argument consistent with a reading of the complaint that's favorable to the plaintiff here? It sounds like a reading of the complaint that's favorable to docs. I think- I don't mean to suggest this silently, but I think plaintiff's allegations in some respect are favorable to docs. I mean, if you look at page 57 of the joint appendix, it says that docs approved the religious accommodation. If it were some other way, then, you know, plaintiff could have alleged and in fact had two different opportunities to allege that docs did not in fact approve the accommodation. There was one motion to dismiss. 57 is the decision, yes. Sorry, I might be getting the page incorrect on that. Page 37, 37. It's transposed. But it says defendants asserted and approved plaintiff's request for an accommodation subject to conditions, and then plaintiff complied and defendants ultimately approved her wearing the hijab. And so that doesn't evince what is a religious accommodation denial type of claim where a plaintiff can- The issue again is it starts off with defendants asserted. It approved. I think that that is- that there's obviously a dispute here because she says this is not a full reasonable accommodation, and we've already gone back and forth a little bit, and I appreciate your answers, about the fact that the letter is arguably, if we were to see this in terms favorable to her, arguably ambiguous, and doesn't tell the whole story of the accommodation. So the full accommodation as a matter of her religious tenets includes I cannot take off my hijab in front of a man who is not a family member. And that request, Mr. Jacobs mentioned, was made at a relevant time. It wasn't made after the fact. You know, you forced me after the fact. It was made at a time where docs or two, somebody could have further accommodated it. If we look at all of that in a way that's favorable to her, then as I understand it, this is my second question, you would agree that that might be a material alteration in the terms and conditions of her employment that's cognizable under 703A. So I think if you disagree, I mean, if you disagree with our argument, which is another way to frame this, with our argument that she didn't object, agree to the terms of the accommodation, the accommodation didn't in fact set those terms forward, and docs simply wanted to do this, and she said, no, no, no, I don't understand the accommodation. If you ask me to do that, give me an accommodation from something that isn't about the original accommodation itself, then we think that's probably a new accommodation that's being requested. And is that cognizable? And that I think would be cognizable in those circumstances, but what we have here is at least the original accommodation letter talks about a safety check. The original accommodation letter talks about the check by the deputy superintendent of safety. It talks about the hijab being pulled off. So we think this is all bundled up in that original accommodation and not really a separate accommodation. What do you make of this? It's not entirely clear to me, too, what we're talking about on JA-20. Is it a separate letter? Is it in the same letter where the diversity management office then says that if Ms. Billings indicates she can't remove the hijab in front of other people, she can be provided with a private area to remove it? So that to me is a separate one. So you're talking about paragraph 23, a separate communication. So what do you make of that? How is that not part and parcel of the original accommodation? And what happens subsequently with our twos is a failure to comply with the original accommodation. So I think the diversity office and I think the best reading of that is to the extent you can have it be possible to remove the hijab in a private area, then let her do that. And they, in fact, did that. Deputy Superintendent Murphy did that with respect to the size of the hijab. They let Billings go to a private area to reduce the size of her hijab. But with respect to safety inspection in terms of how something gets pulled off or not, it's not like you can walk into an empty room, pull it off, put it back on, and then come back out and say, look, I've successfully pulled off my hijab. So I think there's a practicality aspect of that, and that aspect of it I don't think was at least implied. So you're saying that's not what is stated in paragraph 23? There is no suggestion that she should be allowed to remove it in a private area? There is a suggestion that she should be able to. There are many different conditions to this accommodation letter, right? There's like six or seven different conditions to the accommodation letter. The removal, in your view, only relates to determining the size of the hijab and not its removability? No. Yeah, I think it's not just the size of the hijab if she wanted to, for instance. Does it say that? No, this paragraph doesn't say that. So where do we get that limitation? I think we get it because it would be illogical to read it that way. I think it would be implausible to say, look, you can take it off on your own in an empty room. I'm actually going to go back to the night, and I read this to the government when the government was up at the podium, to make out a prima facie case. And this is where we are, right? Yes. Of religious discrimination, plaintiffs will show they held a bona fide religious belief conflicting with an employment requirement. Do you agree with that? No. They informed their employers of the belief. Do you agree with that? Mm-hmm. They were disciplined for failure to comply with the conflicting employment requirement, which is the subject of this appeal, the dispute as I understand it. And you would disagree with that? Yeah, I don't know how to frame this, but I think- What part of the prima facie case is not met here? So I think, at least with night, I think it's talking about a species of claims in which there's some sort of discipline that happens. Yes. What we're talking about here is if you have a- Like, I can imagine a scenario where you have a conflicting employment requirement, and your employer says, this is going to be how I accommodate that conflicting employment requirement. You've satisfied those two standards of the test, and the employer says, look, after that, if you agree to that, we're good. If you don't agree to that, there might be- You know, you have to kind of- We have to negotiate this. But what we're in is a situation where we think that there is that sort of agreement, where even if this were normally something that somebody could think of, well, maybe this is reasonable, maybe this is unreasonable. Just so that I understand, that's because you don't think that night necessarily forecloses an action like this. If we had gone through, and there was not this arguable ambiguity about what she agreed to, what she didn't agree to, or as you put it, if we disagree with you on all that, night would not foreclose her action. Yeah, I think night's language about discipline would not foreclose this action, at least. I think other, you know, I do think the employment accommodation request does have to be employment related. We don't think that an accommodation denial in and of itself is automatically actionable. You can't just, you know, if there's something that's outside of the workplace that's happening and that's not formally part of the workplace, we don't think an accommodation denial as to that would be- And is it also the state's view that VEGA sheds light on this issue? Yeah, I mean, VEGA does, but I think it does more in setting out the basic elements of what a prima facie case is. I mean, VEGA's cited in every decision on this card, so I think it does set forth the elements. But I think what we're talking about is, and what the state's argument rests on, is this sort of unique situation where there's, in fact, an accommodation approval, and then what happens after that? Once you get an approved accommodation, what are your obligations as an employee after that? And what are your obligations as an employer to do more than what the accommodation letter expressly sets out? And again, if we disagree with you on the sort of the predecessor issues on the facts of this case, is it the state's view that we should wait for a decision in Muldrow? No, I don't think so. There was two colloquies with Justice Gorsuch and Muldrow where they talk a little bit about this consent issue, where he says, could an employer in advance say, these are the terms and conditions that you agree to? And the petitioner said, yes, we think under certain circumstances, the government demurred a bit, I think, on that. And he says, no, I think that might still be terms and conditions under certain circumstances. But I think that's, I don't want to call it completely orthogonal, but it's a little bit of a side or tangential issue to what's actually being decided in Muldrow, which is an instance where you don't at all have that type of agreement or consent. Oh, we've been surprised before, as you know. Yeah. So, okay. Thank you. Thank you very much. Mr. Bergeron. There were questions about night. The element, plaintiff must show discipline for failure to comply. But courts have gotten around that. Hold on one second, Mr. Bergeron. You're losing your audience. Stop the clock. Thank you. I'm sure it's nothing personal. You know, I'll ask the court and deputies to just return it to two minutes. Yes. I think they've decided. I'm like the ref who's giving you back ten seconds. Okay. Okay, there were questions about night and how do we get around one of the elements of the crime efficient case, the plaintiff must show discipline for failure to comply. We get around night because she was essentially given what we call a cruel choice, and that's a phrase that turns up in some of these cases. A cruel choice between religion and employment. What if the plaintiff complies with. Right. And what if the plaintiff complies under duress? Right? It's called an impossible choice, so that's what we had in our brief. You know, she could say, no, I'm standing firm on my religious principles, but then she sent home to deal with the consequences. That's how you get around night. It's sort of a threat of discipline. If you don't do what we tell you to do, that's an adverse action. And there's a couple of cases. There's Sombrano Fifth Circuit. It's an unpublished decision, but it's 2022, so it has some recent discussion. Abramson, the Alito concurrence. You know, you comply, but you compromise your religious principles. That sounds like an adverse action. Remember Vega, we've been talking about Vega, minimal inference of discrimination. You don't even have to- If we approached it that way, the case wouldn't be unique. Am I correct? If we approached it what way? The cruel choice? Yes. Oh, sure. I don't see it as that unique. She's told do it our way. It conflicts with your religious principles, but do it our way or consequences. From our perspective, it's not unique in terms of there's going to be an adverse action if you don't do it our way. See, the alternative is for her to not comply, be insubordinate. She gets disciplined. Then she has an ironclad adverse action. I got fired. I got demoted. I was suspended. And, you know, that's the problem with the state's position here. If she really wants an adverse action, then be insubordinate. Who wants to be insubordinate? And there are cases that talk about it. Well, no, no. That's not fair. As I understand it, the argument is that she agreed to an accommodation that was set out in the letter that's on page 53 and 52, 53, and, you know, that's it. But that's not it. Because when she showed up, it was a new event. And it's like, wait a minute, I can't do it in front of you. I need a woman. So that's another accommodation request at a minimum. And it's also a failure to carry out the accommodation in a manner that's consistent with Title VII. And then we get back to the impossible choice. You know, and do we really want employees to be insubordinate in order for them to have a genuine, indisputable adverse action? I agree that if you look at the letter, it sets out the conditions that are to be satisfied, frankly, by both sides. And there's no, at least alleged, there's no disagreement at that point. Until she shows up on May 2nd. And that's a new opportunity for a new interactive process. We can't do this. I don't know of any case that says that once an accommodation is put in place, that if it's not carried out consistent with Title VII or the ADA, that you are, there is no- Well, let me ask you this, the following. If the, and again, this is a hypothetical. I appreciate it. And I hope you appreciate it. But if the letter had or contained, among all the other conditions, it said, and the superintendent is Artuse, and he is a man. Would your client then have a claim of a failure to accommodate? Or would Mr. Phan's argument be correct that she had effectively agreed to that form of accommodation? Or can someone change, the other way of putting it is, can an employee change her mind at the last minute about what is and isn't a reasonable accommodation? I don't know if you can change your mind so cavalierly, but I don't know if this would be a cavalier change of mind. If the letter said, Artuse will be the one to do the demonstration, that's what it said. My guess is she would say no. Artuse is a man, I can't do it in Artuse's presence. Reconsider, or go back and change this. And if they said no, well then that's a denial of reason. Wouldn't that implicate the conferral process? That's the interactive process. If the letter said, Artuse will do the demonstration, and she said no, let's have an interactive process. That's what the statute contemplates. Yeah. But that's the hypothetical. I assume if that's what the letter said, she would object. She would object. I can't do it in front of Artuse. Find the woman. So was it ambiguous who the deputy superintendent of whatever the title was? Is that an ambiguous thing? Well, that's like saying the attorney general will do it, but it's not going to be the attorney general. We wrote in our brief, you know, you're assuming that the employee knows who the deputy superintendent is. Is it a waiver because she didn't object when they said deputy superintendent of security? The plaintiff probably assumes they're not going to violate my religious principles. Take a look at what most employees think when they're working with management. They assume they're not going to do anything that blatantly violates their religious principles. So I don't know if that's a waiver. On a Rule 12 vega thing, I don't know if you can really assume a waiver because of language like that. Thank you. Thank you. Thank you both. Thank you all for it.